KELLUM, Judge.
Brandyn Josephe Benjamin, currently an inmate at Holman Correctional Facility on Alabama’s death row, appeals the circuit court’s denial of his petition for post-conviction relief filed pursuant to Rule 32, Ala. R.Crim. P.
*429 In 2004, Benjamin was convicted of murdering Jimmie Lewis during the course of a first-degree robbery, a murder defined as capital by § 13A-5-40(a)(2), Ala.Code 1975. The jury recommended, by a vote of 10 to 2, that Benjamin be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Benjamin to death. After remanding Benjamin’s case for the circuit court to correct its sentencing order, we affirmed Benjamin’s conviction and his sentence of death on direct appeal. See Benjamin v. State, 940 So.2d 371 (Ala.Crim.App.2005), cert. denied, 549 U.S. 997, 127 S.Ct. 494, 166 L.Ed.2d 372 (2006). This Court issued the certificate of judgment making Benjamin’s direct appeal final on April 21, 2006.
On April 17, 2007, Benjamin filed a timely Rule 32 petition in the Houston Circuit Court attacking his conviction and death sentence. He filed an amended postcon-viction petition in March 2008. In August 2008, the circuit court partially dismissed some of Benjamin’s claims. An evidentia-ry hearing was held on the remaining claims, and in July 2011 the circuit court issued a 33-page order denying Benjamin’s postconviction petition.[1] Benjamin then filed a timely notice of appeal to this Court.
In its order sentencing Benjamin to death, the circuit court set out the following facts surrounding Lewis’s murder and Benjamin’s conviction:
“The victim, Jimmie Lewis, had gone to Wiregrass Commons Mall about 9:00 p.m. on the night of November 18, 2000, to pick up his wife, who operated a shop in the mall. He had gone to Mrs. Lewis’ shop and determined that she was ready to close, and because it was raining outside, he returned to bring the car closer to the mall exit so that Mrs. Lewis wouldn’t get wet. Mr. Lewis had parked his car in a remote area of the mall parking lot. The defendant had gone to the mall with the specific intent of finding a victim to rob. He watched mall security to see how often they made rounds and also parked his car in an area which wouldn’t raise suspicion. As Jimmie Lewis approached his car, the defendant appeared and apparently demanded the victim’s wallet. A struggle ensued, and the defendant struck the victim several times and shot him twice — once in the chest and once in his leg. The defendant took the victim’s wallet and contents and left the scene. The victim was dead when the police and paramedics arrived shortly thereafter. The defendant later related all of the details of the crime to a friend[, Michael Baker,] indicating that he had no remorse for his actions. [Baker then] went with his attorney to the District Attorney. The District Attorney arranged for a body wire to be placed on [Baker] so that the police could hear the defendant confess his actions once again to [Baker]. The defendant was then arrested and his room searched. A copy of the Dothan Eagle newspaper account of the crime was found in the defendant’s room and later the victim’s wallet was also found.”
(Trial C.R. 202.)

Standard of Review

Rule 32.3, Ala. R.Crim. P., provides, in pertinent part: “The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.” “ ‘When reviewing a circuit court’s rulings made in a postcon- *430 viction petition, we may affirm a ruling if it is correct for any reason.’ ” Lee v. State, 44 So.3d 1145, 1149 (Ala.Crim.App.2009), quoting Bush v. State, 92 So.3d 121, 134 (Ala.Crim.App.2009).
The majority of the claims raised by Benjamin involve allegations that his trial attorneys were ineffective. In order to prevail on a claim of ineffective assistance of counsel, a petitioner must show: (1) that counsel’s performance was deficient; and (2) that he was prejudiced by the deficient performance. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
“Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ See Michel v. Louisiana, [350 U.S. 91] at 101 [ (1955) ]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.”
Strickland, 466 U.S. at 689 (citations omitted). As the United States Supreme Court further stated:
“[Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.”
Strickland, 466 U.S. at 690-91.
“The Sixth Amendment right to counsel guarantees a fair trial, not a perfect one.” Willis v. United States, 87 F.3d 1004, 1008 (8th Cir.1996). “The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.” Yarborough v. Gentry, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003). “Effective counsel does not mean errorless counsel.” Birt v. Montgomery, 709 F.2d 690, 705 (11th Cir.1983).
At trial, Benjamin was represented by attorneys Michael Crespi and Kalia Lane. Both testified at the postconviction eviden-tiary hearing.
I.
Benjamin first argues that his counsel was ineffective for failing to effectively ar *431 gue a Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), motion. In Batson, the United States Supreme Court held that it was a violation of the Equal Protection Clause to strike a black prospective juror from a black defendant’s jury based solely on the juror’s race. This holding was extended to white defendants in Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1864, 118 L.Ed.2d 411 (1991), to defense counsel in criminal cases in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), and to gender-based strikes in J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
The record of Benjamin’s trial shows that both the State and Benjamin were allowed 15 peremptory strikes. The strike list indicated that the State struck 9 white jurors and 6 black jurors. Benjamin used all of his 15 strikes to remove white prospective jurors. After the jury was struck, Benjamin’s counsel made a Batson objection and argued that 7 black prospective jurors remained on the venire after the strikes for cause and the State used 6 of its 15 strikes to remove black prospective jurors. (Trial R. 123.) The court then asked the prosecutor to state its reasons for striking the six black jurors. (Trial R. 125.) In the postconvietion proceeding, Benjamin challenges the removal of only three of those black prospective jurors.
Initially, Benjamin argues that he was not required to plead or prove any prejudice because, he says, prejudice is presumed in a Batson context. The Alabama Supreme Court in Ex parte Yelder, 575 So.2d 137 (Ala.1991), first held that under the Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), test an attorney’s failure, to make a Batson objection when the record clearly established a prima facie case of purposeful discrimination is subject to the “presumed prejudice” standard. The Court reaffirmed this holding in Ex parte Frazier, 758 So.2d 611, 616 (Ala.1999). However, neither the Yelder Court nor the Frazier Court addressed whether the presumed-prejudice standard applies when an attorney does make a Batson objection, as the attorney did in this case, or whether that standard applies when a defendant raises the issue as an ineffective-assistance-of-counsel claim in a postconviction proceeding. Both Yelder and Frazier were cases on direct appeal, cases where the standard of review and burden of proof are different than appeals from the denial of a Rule 32 petition.
Other courts have declined to extend the presumed-prejudice standard to a claim of ineffective assistance of counsel in regard to a Batson claim.
“Batson errors are not presumptively prejudicial when raised in an ineffective assistance of counsel claim. Young v. Bowersox, 161 F.3d 1159, 1161 (8th Cir.1998); Davidson v. Gengler, 852 F.Supp. 782, 787 (W.D.Wis.1994); see Strickland, 466 U.S. at 692, 104 S.Ct. 2052 (stating that certain Sixth Amendment errors are presumptively prejudicial: ‘actual or constructive denial of the assistance of counsel altogether’; ‘state interference with counsel’s assistance’; and ‘an actual conflict of interest’). In Strickland, the Supreme Court stated that, apart from conflicts of interest, prejudice is only presumed when the constitutional error is easily identified and when ‘the prosecution is directly responsible.’ Strickland, 466 U.S. at 692, 104 S.Ct. 2052. In the context of this specific Batson challenge, the defendant is not challenging any action by the prosecutor. Rather, he is challenging his own attorney’s alleged violation of Batson. Moreover, the record is clear that King’s attorney raised a Batson *432 objection and argued it to the trial court and on appeal.”
United States v. King, 36 F.Supp.2d 705, 710 (E.D.Va.1999).
“With respect to prejudice, Wright has argued ... that requiring defendants to show prejudice by showing the likelihood of a different outcome asks of them the impossible. That is, how can Wright ever show that if a different jury had been seated it would have acquitted him? Wright suggests he should have to show only that a different, impartial jury would have been seated in order to demonstrate prejudice. We disagree because ‘[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.’ Strickland, 466 U.S. at 691, 104 S.Ct. at 2066.”
Wright v. Nix, 928 F.2d 270, 273 (8th Cir.1991).
“[T]his Court holds that counsel’s failure to raise a Batson objection, absent any attempt by [the appellant] to demonstrate that unqualified persons served on the jury, does not amount to a structural defect that entitles him to a presumption of prejudice.”
Strong v. State, 263 S.W.3d 636, 648 (Mo.2008). Irrespective of the standard that we use in evaluating this claim, Benjamin failed to show that his Batson objection would have ultimately been successful.
Throughout Benjamin’s brief he faults the State’s failure to present more evidence at the postconviction hearing concerning the prosecutor’s reasons for removing the three challenged jurors. As we have stated, however, this Batson claim was raised in a postconviction proceeding. As our neighboring State of Georgia has stated: “[I]n the context of an ineffective assistance of counsel claim, it was Pierce’s burden, not the State’s, to ensure that the trial court had sufficient information to determine the merit of a Batson challenge.” Pierce v. State, 286 Ga. 194, 200, 686 S.E.2d 656, 662 (2009). See also Commonwealth v. Smith, 609 Pa. 605, 638, 17 A.3d 873, 892 (2011) (“[I]n Commonwealth v. Uderra, 580 Pa. 492, 862 A.2d 74, 86 (2004), we held that in cases on collateral review like the one before us, where no Batson challenge was raised during voir dire and the only viable claim is one of counsel’s ineffectiveness for failing to raise a Batson objection during voir dire, the postconviction petitioner may not rely on Batson’s burden-shifting formula, but instead bears the burden in the first instance and throughout of establishing actual, purposeful discrimination by a preponderance of the evidence.”).
“To succeed on [Benjamin’s] claim of ineffective assistance of counsel, [Benjamin] was required to show not only that trial counsel should have raised a Batson challenge, but also that the challenge would have been successful.” Pierce, 286 Ga. at 199, 686 S.E.2d at 661.
The record of the voir dire examination of the prospective jurors in Benjamin’s case reflects that the jurors completed juror questionnaires.[2] (R. 14.) However, those questionnaires related to the challenged jurors were not introduced during the postconviction proceeding. Nor did any of the challenged jurors testify at the postconviction hearing.
“Under the recent United States Supreme Court decision in Miller-El v. Dretke, [545 U.S. 231 (2005),] a court must look at the totality of the jury-selection process to determine whether *433 the prosecutor’s stated reasons for a particular peremptory challenge are pretext for discrimination.”
Ford v. State, 122 Nev. 398, 401, 132 P.3d 574, 576 (2006). Therefore, we do not have the entire voir dire before us to evaluate this Batson claim; thus, we cannot consider the totality of the jury-selection process as Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005), dictates.
Nonetheless, we will attempt to address each challenged juror individually.
A.
The circuit court made the following findings of fact concerning Benjamin’s claim that his trial counsel’s performance was ineffective for failing to effectively argue the Batson objection regarding juror C.B.:[3]
“[Benjamin] in his Rule 32 petition seeks relief for the State’s peremptory strike of [C.B.], an African-American. During the Batson hearing the State submitted and the Court concurred that she was struck for the race neutral reason that she had concerns over the use of secret police recording of conversations. [Benjamin] now contends that the record shows that she did not have such concerns. During voir dire, there were exchanges of conversation between the prosecutor and several venire-members over this issue. [Benjamin] contends that [C.B.] never had any such concern where the State contends that she appears to have had initial concern but following colloquy with the prosecutor she no longer had such concern. Either way, Mr. Crespi did not challenge this strike along these lines.
“After review of the transcript, the Court cannot state [Benjamin] has met his burden of proof as to his version of the exchange. Smith v. State, 590 So.2d 388 (Ala.Crim.App.1991) (a prosecutor may strike from mistake as long as the assumptions involved are based on an honest belief that are race neutral). The trial judge was present and heard the exchanges, conversations and demeanor of [C.B.] and the prosecutors and found that the State met its burden of proof at the Batson hearing....”
(C.R. 1986-87.)
A review of the voir dire examination indicates that C.B. responded to several questions posed by the prosecutor during voir dire. She said that she had previously worked at Wiregrass Commons Mall, where Lewis was murdered, that she had seen a gun fired, and that wearing a “body wire” to tape someone bothered her. (Trial R. 126.) Benjamin argues that she later clarified her view on this issue; therefore, the prosecutor did not have sufficient reason to strike this juror. However, the fact
“[t]hat [the juror] was ultimately ‘rehabilitated’ by the defense did not mean the State had to accept her ambivalent views. See Vargas v. State, 838 S.W.2d 552, 555 (Tex.Crim.App.1992). The reason behind peremptory strikes does not have to rise to the level of a challenge for cause to be considered legitimately race-neutral.”
Green v. State, 839 S.W.2d 935, 939 (Tex.App.1992). See also United States v. Samuels, 543 F.3d 1013, 1018 (8th Cir.2008) (“These were not challenges for cause, where a juror may be rehabilitated and remain on the venire, but were peremptory challenges, where rehabilitation does not preclude the strikes.”); Manning v. State, 765 So.2d 516, 520 (Miss.2000) (“The State admits that Juror Wright-Brewer *434 was rehabilitated enough to withstand a challenge for cause. However, that does not preclude use of a peremptory strikes based upon her juror questionnaire response. ‘[T]he prosecutor’s explanation need not rise to the lével of justifying exercise of a challenge for cause.’ Davis v. State, 660 So.2d 1228, 1242 (Miss.1995).”).
As the United States Supreme Court stated in Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991):
“Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding ‘largely will turn on evaluation of credibility.’ 476 U.S., at 98, n. 21, 106 S.Ct. at 1724, n. 21. In the typical peremptory challenge inquiry, the decisive question will be whether counsel’s race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor’s state of mind based on demeanor and credibility lies ‘peculiarly within a trial judge’s province.’ Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985), citing Patton v. Yount, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984).”
500 U.S. at 365.
We agree with the trial court and the postconviction court that the prosecutor’s reason for striking juror C.B. did not violate Batson.
B.
The circuit court made the following findings of fact concerning Benjamin’s claim that his trial counsel’s performance was ineffective for failing to effectively argue his Batson objection regarding juror R.G.:
“[Benjamin] in his Rule 32 petition challenges the State’s peremptory strike of [R.G.], an African-American. At the Batson hearing, the State responded that it struck [R.G.] because he had previous convictions for two counts of misdemeanor criminal mischief and that he had not responded when the venire was asked as a whole if any member had prior criminal convictions. [Benjamin] contends that the prosecutor did not specifically ask the venire this question and that therefore [R.G.’s] non-response is not a valid reason and that Mr. Cres-pi’s failure to articulate this to the Court is constitutionally defective representation. The defense has failed to offer any evidence that the State acted in bad faith or fraudulently or deceptively in its incorrect assertion to the Court on this issue. It is undisputed that [R.G.] has the convictions alleged by the State and this fact alone is a sufficient race neutral reason for the peremptory strike of [R.G.]. Stephens v. State, 580 So.2d 11 (Ala.Crim.App.1990) (criminal activity by a juror is sufficiently race neutral). Further, a prosecutor may strike from mistake as long as the assumptions are an honest belief and are racially neutral. Smith v. State, 590 So.2d 388 (Ala.Crim. App.1991).”
(C.R. 1987-88.)
Benjamin argues that the record does not support the prosecutor’s reason for removing this juror because the record does not establish that the prospective jurors were asked if they had any prior convictions.
The record of Benjamin’s trial indicates that during voir dire examination the prospective jurors were asked twice if any *435 member of their family had been convicted of a crime. Question number 11 on the juror questionnaire also asked: “Have you, any member of your family or anyone you know ever been accused of a crime?”[4] A subpart of this question was “What result?” Thus, the voir dire examination does support the State’s assertion that the prospective jurors were asked if they had any prior convictions. We do not know R.G.’s response, if any, to this question on the juror questionnaire. During voir dire, juror R.G. was asked to approach the bench. Juror R.G. admitted that he had been convicted of two misdemeanor counts of criminal mischief. (R. 115.)
Alabama has long held that “[s]trikes based on prior criminal convictions are not racially discriminatory in nature as such and [are] ... race neutral.” Darby v. State, 601 So.2d 117, 118 (Ala.Crim.App.1989).
“A connection with or a founded suspicion of criminal activity can constitute a sufficiently race-neutral reason for the exercise of a preemptory strike. Stephens v. State, 580 So.2d 11 (Ala.Crim. App.1990), aff'd, 580 So.2d 26 (Ala.1991); Powell v. State, 548 So.2d 590 (Ala.Crim. App.1988), aff'd on other grounds, 548 So.2d 605 (Ala.1989); Lynn v. State, 548 So.2d 704 (Ala.[Crim.App.]1987), aff'd, 543 So.2d 709 (1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989). This connection with or suspicion of criminal activity includes the juror in question, as well as close relatives and friends of the juror. Stephens; Allen v. State, 555 So.2d 1185 (Ala.Crim.App.1989); Lynn.”
Heard v. State, 584 So.2d 556, 560 (Ala.Crim.App.1991).
Benjamin further argues in brief that the prosecutor’s explanation for striking R.G. — that he had two prior convictions — was a sham because, he says, another juror — A.H., a white juror — was not struck for the same reason. However, the record indicates that juror A.H. did not have a prior conviction but that her son had a prior conviction. Accordingly, these two jurors were not similarly situated and there is no evidence that this reason for striking juror R.G. was a sham or pretext.
“As we confirmed in Purkett v. Elem, 514 U.S. [765] at 768, 115 S.Ct. 1769 [ 1995) ], the critical question in determining whether a prisoner has proved purposeful discrimination ... is the persuasiveness of the prosecutor’s justification for his peremptory strike. At this stage, ‘implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.’ Ibid. In that instance the issue comes down to whether the trial court finds the prosecutor’s race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor’s demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.”
Miller-El v. Cockrell, 537 U.S. 322, 338-39, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). “Whether the opponent satisfies his burden of persuasion to show that the proponent’s facially race-neutral explanation for his strike is pretextual, not genuine, is a question of fact for the trial court to resolve in the first instance.” Watkins v. *436 State, 245 S.W.3d 444, 447 (Tex.Crim.App.2008):
We agree with the trial court and the postconviction court that the prosecutor did not violate Batson in striking R.G.
C.
The circuit court made the following findings of fact concerning Benjamin’s claim that his trial counsel’s performance was ineffective for failing to effectively argue his Batson objection regarding juror B.D.:
“[Benjamin] challenges the State’s peremptory strike of [B.D.], an African-American. She stated during the voir dire that she knew Ms. [Geneva] Cull, who apparently was on the jail logs as a visitor to [Benjamin] and testified as a witness in the penalty phase, Mr. Jeffrey, [Benjamin’s] deceased grandfather, and Reverend Robert Jones, who was a mitigating factor witness for the defense in the event of a penalty phase trial. [Benjamin] has failed to shmy how Mr. Crespi’s representation was defective in regard to [B.D.] as he did make a Bat-son objection. Hawkins v. State, 594 So.2d 181 (Ala.Crim.App.1991) (striking a potential juror who knows a defense witness is race neutral).”
(C.R. 1988.)
We have frequently stated:
“Strikes based on the veniremember’s relationship to or acquaintance with the defendant or with the defendant’s witnesses have generally been upheld. E.g., Ex parte Lynn, 543 So.2d 709, 711 (Ala.1988) (one veniremember’s ‘husband was related to the defendant’; another veniremember was ‘a classmate of the co-defendant’ and had ‘a child by the co-defendant’s brother’), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989); Wilsher v. State, 611 So.2d 1175, 1182 (Ala.Cr.App.1992) (venire-members acquainted with both defendant and defense witnesses; court also noted the correlation between this reason and a challenge for cause based on the veniremember’s acquaintance or relationship with a party or witness); Knight v. State, 622 So.2d 426 (Ala.Cr.App.1992) (veniremember ‘had known the [defendant] for many years’ and the defendant ‘had asked her for a date on a couple of occasions’); Williams v. State, [627 So.2d 994] (Ala.Cr.App.1992) (veniremember knew or was related to defense witness), affirmed, [627 So.2d 999] (Ala.1993); Strother v. State, 587 So.2d 1243, 1247 (Ala.Cr.App.1991) (veniremembers acquainted with defendant); Bass v. State, 585 So.2d 225, 237 (Ala.Cr.App.1991) (veniremember acquainted with defense witness); Davis v. State, 555 So.2d 309, 314 (Ala.Cr.App.1989) (veniremember acquainted with defense witness). ‘Acquaintance with a defendant or his family has been previously held to be a race-neutral reason for a strike. Jackson v. State, 549 So.2d 616 (Ala.Cr.App.1989).’ Jackson v. State, [640 So.2d 1025] (Ala.Cr.App.1992), remanded on related grounds, [640 So.2d 1050] (Ala.1993). See also Avery v. State, 545 So.2d 123, 126 (Ala.Cr.App.1988).”
Rowe v. State, 625 So.2d 1210, 1211-12 (Ala.Crim.App.1993).
“Batson simply requires that explanations for peremptory strikes be ‘clear, specific, and legitimate,’ ‘relate[d] to the particular case to be tried,’ and ‘nondiscriminatory.’ Batson, 476 U.S. at 97, 106 S.Ct. at 1723. The fact that a veniremember knows or is acquainted with a party or witnesses to be called by a party meets this requirement.”
Wilsher v. State, 611 So.2d 1175, 1183 (Ala.Crim.App.1992).
*437 Benjamin also argues in brief that the reason for striking B.D. was pretextual because, he says, neither the prosecutor nor defense counsel attempted to conduct any meaningful voir dire of B.D. concerning her relationship with the three named individuals.
Regardless of whether counsel rehabilitated B.D. the prosecutor would still have had a valid reason for striking B.D. “A peremptory challenge does not have to be supported by the same degree of justification required for a challenge for cause.” Stewart v. State, 662 So.2d 552, 558 (Miss.1995). “Batson was not intended to remove all prosecutorial discretion in peremptory strikes, but rather to eliminate the odious practice of eliminating potential jurors simply because of race.” Washington v. Commonwealth, 34 S.W.3d 376, 379 (Ky.2000). Defense counsel had no duty to rehabilitate this juror given that her initial response supported the prosecutor’s use of a peremptory strike.
We agree with the trial court and the postconviction court that the prosecutor’s reason for striking juror B.D. did not violate Batson.
Benjamin failed to establish that his Batson challenge would have been successful. See Pierce, supra. The circuit court correctly denied relief on Benjamin’s claim that his trial counsel was ineffective in arguing his Batson claim.
II.
Benjamin next argues that the circuit court erred in denying his claim that his counsel was ineffective for failing to conduct a reasonable investigation and to present available evidence during the guilt phase of his capital-murder trial. Specifically, Benjamin argues that counsel “failed to interview any non-mitigation witnesses, failed to investigate the crime scene, failed to interview the State’s pathologist [Dr. Alfredo Parades], failed to interview the State’s firearms expert [Katherine Ric-hert], failed to hire a pathologist, failed to hire a firearms expert, and failed to replace his investigator.” (Benjamin’s brief, p. 60.) Benjamin states that this evidence would have exonerated him.[5]
The circuit court made the following detailed findings of fact regarding this claim:
“When reviewing an ineffective assistance of counsel claim the Court must give consideration to the evidence presented by the State. Lee v. State, 44 So.3d 1145 (Ala.Crim.App.2009). In the present case careful consideration must be given to the State’s evidence. First is an incriminating statement given to the police by [Benjamin]. In the statement [Benjamin] admits struggling with the victim and admits that the victim was shot by [Benjamin’s] gun and that he intended to rob the victim. Second is additional incriminating evidence that [Benjamin] related his involvement in the robbery and homicide to a friend (Michael Baker) and that the police found the victim’s wallet and a newspaper clipping of the crime at [Benjamin’s] residence. ... The only rational versions of the crime were that [Benjamin] intentionally killed the victim during the course of a robbery (State’s version) or that [Benjamin] unintentionally killed the victim during a robbery ([Benjamin’s] version). Crespi made the strategic decision to pursue a lesser verdict of felony murder. Michel v. Louisiana, *438 350 U.S. 91 (1955); Hunt v. State, 940 So.2d 1041 (Ala.Crim.App.2005). Clearly, this was the correct decision under the facts as established primarily by [Benjamin’s] own words. Although not specifically stated by [Benjamin] in the pending proceeding, he does not appear to challenge or object to this overall defense presented by Mr. Crespi.
“Specially, though, [Benjamin] claims deficient representation by not obtaining forensic/scientific testing and analysis (trigger-pull on the pistol, blood in the Defendant’s car, victim’s injuries) and failure to investigate the claims of some of the State’s witnesses (Katherine Rie-hert, Alfredo Parades, Michael Baker, and Jerry Stevens)....
“The record discloses that Dr. Parades was thoroughly cross-examined by Mr. Crespi with a focus on eliciting testimony favorable to the defense of an unintended homicide: Dr. Parades did not examine the victim’s clothing for gunshot residue; Dr. Parades admits the pants should have been examined for gunshot residue; Kathy Richert should have examined the clothing for residue; Dr. Parades could not determine the order of the victim’s injuries; Dr. Parades does not know the time between the victim’s injuries; Dr. Parades did not conduct a microscopic examination of the victim’s hands; Dr. Parades admits that the victim’s wounds could have occurred during a struggle with the assailant; Dr. Parades states that it was possible that some of the victim’s facial injuries could have come from falling to the pavement; there were no broken bones in the victim’s face; there could be residue on the clothing but not on the body; Dr. Parades cannot say the distance the shot into the victim’s leg was.
“The Court finds that Dr. Parades was thoroughly examined by Mr. Crespi on all important facts and that Mr. Cres-pi elicited favorable testimony from Dr. Parades that aided in the defense of an unintentional homicide. The cross-examination was complete and highlighted the weaknesses of the State’s theory and the strengths of the defense’s theory. Mr. Crespi effectively used the State’s witness to elicit facts and evidence, or the lack thereof, that were beneficial to the defense.
“[Benjamin] contends that trial counsel was constitutionally deficient by not conducting an independent test of the victim’s clothing for gunshot residue. Attempting to prove criminal intent to kill, the State argued that [Benjamin] shot the victim in the leg from a distance while the victim was on the ground. [Benjamin] now contends that testing of the victim’s clothing could have established that he and the victim were much closer when the victim was shot in the leg, which he submits would bolster his argument of an unintentional discharge of the pistol. Mr. Crespi stated, though, that he was concerned that such testing could have revealed no residue and thus bolster the State’s theory of the case. Accordingly, at trial the defense would have been faced with having its own evidence used to discredit its primary defense of an unintended shooting. In all likelihood having an expert retained by the defense on the premise that he would offer exculpatory evidence, only to have him called as a State’s witness to incriminate [Benjamin] would have destroyed any chance that the jury might agree with [Benjamin’s] theory. If the evidence had aided the State, the defense would have lost a great amount of credibility and appeared foolish and amateurish. Additionally, Mr. Crespi on cross-examination challenged Dr. Parades’s testimony that [Benjamin] was afar at the time the victim’s leg was *439 shot. Mr. Crespi through his examination and argument challenged the State for its failure to analyze the victim’s clothing for residue.
“Mr. Crespi was forced at the time to make a strategic decision and he seriously considered both options, weighed the risks and benefits, and rather than gambling his entire defense with the outcome of the test, which was uncertain, he made a reasoned and professional judgment to attack the State’s lack of testing and rely on a favorable cross-examination of Dr. Parades. [Benjamin] has offered no evidence that Mr. Crespi did not make an objectively reasonable and educated strategic decision to forgo independent testing of the victim’s pants. ‘Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable.’ Duncan v. State, 925 So.2d 245 (Ala.Crim.App.2005).
“[Benjamin] in the Rule 32 proceeding had the victim’s pants analyzed and the analysis has revealed the presence of gunshot residue, which would have been favorable to the defense at trial. The standard for a Rule 32 petition for ineffective assistance of counsel is not whether in hindsight the decision was incorrect, but rather was it a reasonable strategic decision based upon the best available facts at the time. Ex parte Womack, 541 So.2d 47 (Ala.1988). Dr. Parades admitted on cross-examination that he could not say how far away the men were at the time of the shooting. If the defense had obtained independent testing of the clothing and the results had showed no residue the State could have presented this evidence to the jury and [Benjamin’s] primary defense would have lost a great deal of credibility. As a result, Mr. Crespi (and for that matter the prosecutors as well) was placed in the difficult position of deciding whether to gamble that the forensic testing could develop exculpatory evidence or lose the gamble and seal his client’s fate. Again it must be kept in mind that the defense could argue the State’s ‘lack of evidence’ on this issue and continue to preserve the strongest defense.
[[Image here]]
“At the Rule 32 trial [Benjamin] offered testimony from Dr. Michael Do-berson, a forensic pathologist. Dr. Do-berson offered his opinion that it was unknown which shot was fired first, that the victim and [Benjamin] may have struggled, he does not know how far away the shooter was when the victim was shot in the leg, he does not know whether the victim was on the ground when he was shot and that the superficial injuries could have been caused by falling or something other than being hit with a gun. A comparison of Dr. Dober-son’s testimony and Dr. Parades’s testimony shows a great deal of similarity and virtually no area of disagreement. Further, the examination of Dr. Parades by Mr. Crespi was just as thorough as that performed by [Benjamin’s] attorneys on Dr. Doberson at the Rule 32 trial. If Dr. Doberson had testified at [Benjamin’s] trial he would have offered both exculpatory testimony as well as incriminating testimony, just as Dr. Parades did. The failure to call an expert witness and instead rely on cross-examination does not constitute ineffective assistance of counsel. Davis v. State, 44 So.3d 1118 (Ala.Crim.App.2009).
“At the Rule 32 trial [Benjamin] presented Matthew Nodel as a firearms expert.[6] Based on testing done by Mr. *440 Nodel and his review of evidence in the case, he was offered to give opinions in the area of gunshot residue, firearms and crime scene reconstruction. He stated that the residue on the victim’s pants leg came from 12 inches away, but possibly as far as 16 inches. He stated, though, some uncertainty because he did not use the same ammunition as used in the crime and he could not conduct as thorough testing of the clothing because he had to be nondestructive of the evidence. Also, Mr. Nodel did not test the pistol used in the homicide. Mr. Nodel agreed with Katherine Richert’s testimony regarding the heavier trigger pull on the pistol, a fact that tends to dispel [Benjamin’s] claim of an unintended shooting. Like Dr. Doberson, if Mr. Nodel had testified that that fact alone does not make [Benjamin’s] version consistent or inconsistent. He further submitted that too much information is missing to view this evidence as either favorable or unfavorable to the defense.
“The Court agrees in hindsight that the gunshot residue on the victim’s pants is more favorable to the defense than to the State. However, in viewing all of the evidence there remained ample evidence that should a jury choose to accept it that is sufficient to justify a verdict of guilty as charged. As stated previously, Mr. Cre'fepi made a strategic decision and it is one that was abundantly reasonable when considering the totality of the State’s evidence and that the most viable defense was an unintentional death that would have been severely discredited if no residue had been found by the defense’s expert.
“In his petition, [Benjamin] faults Mr. Crespi for not interviewing Michael Baker and Jerry Stevens. No evidence was presented on this claim at the Rule 32 trial. Rule 32.9(d), Ala. R.Crim. Proc.; Dobyne v. State, 805 So.2d 733 (Ala.Crim.App.2000).
“Accordingly, [Benjamin] has failed to establish that he is entitled to relief on this issue and it is denied.”
(C.R. 1980-86.) The circuit court’s findings are supported by the record.
Crespi testified that he was appointed to represent Benjamin in January 2001, that he was admitted to the Alabama State Bar in 1973,[7] that from 1973 to 1987 he maintained a general law practice, that from 1987 to 1995 he was a circuit judge in Houston County, and that from 1995 until the postconviction hearing he maintained a criminal-law practice in Houston County. He said that as a judge he presided over two capital-murder cases and that as a criminal-defense lawyer he had defended two clients charged with capital murder. Crespi further testified that he requested the services of an investigator and in January 2001 that motion was granted in part — Benjamin requested $5,000 but the court approved $2,000. To investigate for the guilt phase, he said, he hired Russ Austin. Austin died in February 2002, and, though he tried to locate another investigator, he did not hire anyone to replace Austin. Crespi further testified that he moved for funds to hire a mitigation expert, that that motion was granted, that he moved for funds for psychological assistance, and that that motion was granted.[8]
*441 After his discussions with Benjamin, Crespi said, he thought that their best course of action was to present evidence that Benjamin did not have the specific intent to commit capital murder; thus, he said, he requested lesser-included-offense instructions.[9] He spoke with one of the police officers and examined Benjamin’s statement to police and a transcript of the recording made when Michael Baker wore a body wire. Crespi testified:
“[Assistant attorney general]: Would it be fair to say that Mr. Benjamin’s admissions in his statement to law enforcement and in his conversation with Mr. Baker had a limiting effect on what you could present reasonably to the jury in your defense case?
“[Crespi]: Once it appeared that the statement would be admitted into evidence, yes, there is a limiting impact.
[[Image here]]
“[Assistant attorney general]: So, essentially, as you’re saying, your defense theory in this case was there’s no specific intent? Correct?
“[Crespi]: That’s correct.
“[Assistant attorney general]: Okay. And instead, would it be fair to say that you were- — in your arguments and presentation of the case to the jury, as an alternative to the capital murder charge, because there’s no specific intent, you asked them to vote for a lesser included offense such as felony murder?
“[Crespi]: That is correct.”
(R. 523-24.) Crespi also made the following remarks in his closing argument:
“He talked about the very first blow was the blow with the gun to the back of the head. If B.J. Benjamin had gone out there to kill somebody, there is a much better way to use a gun when you’re coming upon someone — somebody’s total blind side than hitting them in the head with it.”
(R. 531.)
Austin conducted some investigation on the case but it is unclear the extent of his investigation before his death. At the postconviction proceedings, the State did introduce a memorandum written by Austin that detailed an extensive interview that Austin conducted with Benjamin at the Houston County jail in January 2001. (C.R. 7762-63.)[10]
Kalia Lane testified that she was appointed to Benjamin’s case as cocounsel in January 2001. She said that she had difficulty communicating with Crespi, that she did little in preparation for trial, and that Crespi was in charge of the guilt phase.
First, Benjamin asserts that trial counsel’s failure to interview the State’s forensic pathologist, Dr. Alfredo Parades, and the State’s firearms expert, Kathy Richert, constituted per se ineffective assistance of counsel.
“There is ... no per se rule that failure to interview witnesses consti *442 tutes ineffective assistance. Ineffective assistance cases turn on their individual facts.” Sanders v. Trickey, 875 F.2d 205, 209 (8th Cir.1989).
‘“[The] failure to conduct a pretrial investigation and interview witnesses is not a per se sixth amendment violation.’ Code v. Montgomery, 799 F.2d 1481, 1484 (11th Cir.1986). A counsel’s decision to not investigate ‘must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.’ Strickland [v. Washington ], 466 U.S. [668] at 691 [ (1984) ]. Also, the question of deficient performance “ ‘is not what is possible or “what is prudent or appropriate, but only what is constitutionally compelled.”’ Payne v. Allen, 539 F.3d 1297, 1315 (11th Cir.2008) (quoting Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987)).”
Hall v. Thomas, 623 F.Supp.2d 1302, 1318 (M.D.Ala.2009). See Commonwealth v. Wallace, 347 Pa.Super. 248, 251, 500 A.2d 816, 818 (1985) (“It is also established that trial counsel’s failure to conduct a more thorough investigation or to interview all potential witnesses does not constitute per se ineffectiveness.”).
Crespi testified on direct examination that he did not interview Dr. Parades. However, on cross-examination he testified that he was in possession of the 12-page autopsy report that Dr. Parades had compiled based on his examination of the victim’s body. (R. 527.) Also, a copy of the report written by Katherine Richert was introduced at the postconviction proceedings and at trial. This report is referenced throughout Richert’s testimony at trial.[11] It is clear that counsel was in possession of the reports that had been written by Dr. Parades and Richert concerning their findings. “An attorney’s decision not to interview witnesses and to rely on other sources of information, if made in the exercise of professional judgment, is not ineffective counsel.” United States v. Glick, 710 F.2d 639, 644 (10th Cir.1983).
Benjamin next argues that his trial counsel was ineffective for failing to inspect and obtain the services of an expert to test the pants that Benjamin was wearing at the time of the shooting for the presence of gunshot residue and to hire a pathologist and a firearms expert.
During the postconviction proceeding, the following occurred during the questioning of Benjamin’s trial attorney:
“Q [Postconviction counsel]: Do you recall there was an issue in Mr. Benjamin’s case over the pants and the gunshot to the leg and how far away the gun was when that shot was fired?
“A [Crespi]: Yes, sir.
“Q [Postconviction counsel]: Did it occur to you that testing for gunshot residue might lend some evidence as to how far away the shot actually was fired from?
“A [Crespi]: Yes, sir. It could — it could be either very favorable or very unfavorable to the defense theory of the case.
“Q [Postconviction counsel]: Did you consult with any experts to help you conclude whether to have the testing done or not?
“A [Crespi]: No, sir, I did not.
“Q [Postconviction counsel]: Did you make an informed decision not to do it?
*443 “A [Crespi]: I was concerned about the possibility that it might not reveal any gunshot residue.”
(R. 471-72.)
Counsel clearly stated that he considered having the pants tested for gunshot residue but declined to do so for strategic reasons. “[Strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.” Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000). “We are mindful that in an ineffective assistance of counsel claim, counsel is ‘strongly presumed to have rendered’ adequate assistance within the bounds of reasonable professional judgment and that we must be vigilant against the skewed perspective that may result from hindsight.” State v. Harris, 343 Wis.2d 479, 495, 819 N.W.2d 350, 358 (2012). “Courts should at the start presume effectiveness and should always avoid second-guessing with the benefit of hindsight.” Atkins v. Singletary, 965 F.2d 952, 958 (11th Cir.1992). “To avoid the ‘distorting effects of hindsight,’ we evaluate counsel’s performance based on his ‘perspective at the time’....” Harned v. United States, 511 Fed.Appx. 829, 830-31 (11th Cir.2013) (not selected for publication in the Federal Reporter).
Moreover, “[cjounsel’s failure to call an expert witness is not per se ineffective assistance, even where doing so may have made the defendant’s case stronger, because the State could always call its own witness to offer a contrasting opinion.” People v. Hamilton, 361 Ill.App.3d 836, 847, 838 N.E.2d 160, 170, 297 Ill.Dec. 673, 683 (2005).
At the postconviction evidentiary hearing, Benjamin presented the testimony of Matthew Noedel, a forensic and firearms expert. Noedel testified that he examined Benjamin’s pants and that his examination revealed the presence of gunpowder. In order to understand the pattern of this residue, he said, he obtained a gun similar to the one used by Benjamin and ammunition similar to what was used and conducted tests. Noedel said that his tests revealed that when the shot that entered the victim’s leg was fired from approximately 12 inches away from the victim, it left a residue pattern like that was found on the victim’s pants. He said that his tests could vary because of the age of the ammunition and the fact that the actual gun was not used.
Benjamin also presented the testimony of Dr. Michael Doberson, a forensic pathologist. Dr. Doberson testified that he examined the photographs of the body and the autopsy report and a gun similar to the one used in the murder. It was his opinion that the wound to the victim’s head was not caused by the end of the gun but that it could have been caused by hitting a rearview mirror on a vehicle as he fell between two vehicles. Dr. Doberson further testified that it was impossible to say which injury occurred first and that the wound to the victim’s leg could have been caused during a struggle.
In rebuttal, the State introduced Benjamin’s statements to police and a transcript of a conversation between Benjamin and Michael Baker that was audiotaped when Baker wore a body wire. Benjamin told police that he took his gun to the shopping mall, that the gun was loaded, that he followed the victim and approached the victim from behind, that they wrestled, that the gun went off twice as they were wrestling, and that when the victim fell he took the victim’s wallet and left in his car.
“Whether defense counsel was ineffective for failure to investigate is determined by the value of the evidence that *444 was not presented at trial and the closeness of the evidence that was presented.” People v. Makiel, 358 Ill.App.3d 102, 107, 294 Ill.Dec. 319, 327, 830 N.E.2d 731, 739 (2005).
The record of Benjamin’s trial establishes that Crespi thoroughly cross-examined the State’s forensic pathologist, Dr. Alfredo Parades, about the victim’s injuries. Crespi concentrated on the fact that the victim’s pants had not been examined for the presence of gunpowder residue,[12] that the pathologist could not determine the precise order of the victim’s injuries, that the shot to the victim’s chest was a contact wound, that the shot to the victim’s leg was not a contact wound, and that based on the evidence it was possible that the shooting took place during a struggle.
Moreover, Benjamin presented no evidence at the postconviction evidentiary hearing that the gun involved in the murder was defective. Benjamin’s experts did not examine the actual gun involved in the murder. Also, during the trial testimony of Katherine Richert, the State’s firearms expert, the following occurred:
“[Prosecutor]: Now, if I could, I want to go back to the .380 and ask you the terminology. Trigger pull. Could you tell me what trigger pull is in relationship to the .380 in State’s exhibit no. 5? Make sure — I think it’s 6?
“[Richert]: 6.
“[Prosecutor]: 6. Thank you. What is the trigger pull in relationship to State’s exhibit 6? Can you tell me what that is?
“[Richert]: Well, trigger pull in general is the amount or pounds of pressure it takes to depress the trigger. In State’s exhibit no. 6, the Davis pistol, which only fires in single action, it takes thirteen pounds of pressure to depress the trigger.
“[Prosecutor]: Can you tell Judge White, as a firearms expert and tool mark examiner, if I use the term hair trigger — in my ignorance, I apologize— or in layman’s terms, what does a hair trigger mean in reference to a trigger pull, the amount of pounds to pull it? Is there a category that is used, like a certain number of pounds that is a hair trigger? After that, you tell me. In other words, it is a regular type or it is a lot of trigger pull, a lot of pounds? Is there a characterization used in your expertise?
“[Richert]: As far as trigger pull goes, a hair trigger, as you say, is just a trigger pull that is going to take very, very little pounds of pressure for it to be depressed. In my experience, I would report out a hair trigger with less than two pounds. And there are normal manufacturing limits of a manufacturer. For example, a normal trigger pull in most semi-automatic weapons would be between five and ten pounds.
“[Prosecutor]: Now, after the five and ten pounds — in other words, going up— and I want to limit it, if I could, to my .380 — and you said how many pounds of trigger pull in your opinion?
“[Richert]: It had thirteen.
“[Prosecutor]: Is that a small or a large or a medium amount in your opinion?
“[Richert]: It’s on a heavier mark, yes, sir.
“[Prosecutor]: If I could ask you, you tell me, in dealing with firearms and manufacturers, is there a purpose that a firearm manufacturer would make a *445 firearm with a heavy trigger pull versus a light one for any particular purpose?
“[Richert]: There’s many manufacturers that produce a very light trigger pull on target firearms. Like, in this particular case, a Davis pistol is not a very good quality pistol. It is on a cheaper level. So, their quality control for their trigger pull is probably not very good.”
(Trial R. 409-11.)
The omitted evidence that was not presented at Benjamin’s trial but was presented at the postconviction evidentiary hearing was evidence indicating that there was gunshot residue on the victim’s pants. Given the strength of the State’s evidence, which included incriminating statements made by Benjamin, we cannot say that Benjamin suffered any prejudice as a result of the exclusion of this evidence.
The vast majority of the remaining evidence that Benjamin presented at the postconviction hearing was presented at trial, albeit via cross-examination of the State’s experts. Crespi vigorously cross-examined the State’s experts. We agree with the circuit court that Benjamin failed to satisfy the Strickland test in regard to this claim.
III.
Benjamin next argues that the circuit court erred in denying his claim that his counsel was ineffective at the penalty phase of his capital-murder trial for failing to prepare and present a mitigation case.
The circuit court made the following findings of fact concerning this claim:
“The general position of [Benjamin] in regard to his claim of ineffective assistance of counsel during the penalty phase is that his lawyers could have done more. The difficulty with this argument is that in any case of any nature an unsuccessful litigant can always in hindsight think of matters that could have been done differently. There has never been a case where additional witnesses could not have been called. State v. Tarver, 629 So.2d 14 (Ala.Crim.App. 1993). Upon thorough review and consideration, the Court cannot conclude that the defense attorneys were constitutionally ineffective or that their work was below minimum reasonable standards. Further, there is no reason to believe that the outcome could have been different had the trial attorneys been as exhaustive as the Rule 32 attorneys have been.
“A key component of the petition on this issue is the apparent breakdown between Mr. Crespi and Cheryl Pettry, a mitigation consultant retained by Mr. Crespi. From the available evidence it appears that at some point Ms. Pettry lost confidence in Mr. Crespi’s ability and sought to stop the trial. She filed an affidavit shortly before trial claiming that [Benjamin] would not receive a fair trial and that the case would be reversed on appeal. The record is abundantly clear that she was incorrect on both grounds. Benjamin v. State, 940 So.2d 371 (Ala.Crim.App.2005). This was after she apparently did a substantial amount of work locating and interviewing witnesses, developing documentary material and a timeline of [Benjamin’s] life, all of which was made available to the defense attorneys.
“[Benjamin] contends that Mr. Crespi essentially did no work on mitigation and that shortly before trial he delegated the mitigation issue to co-counsel Ka-lia Lane. However, the evidence shows that Ms. Lane had worked on mitigation as early as 2001 when she interviewed Deloris Dozier and Elizabeth Gordon and that she received copies of Cheryl Pettry’s work. Also, Ms. Lane subpoenaed [Benjamin’s] school and medical *446 records and continued to locate and speak with possible witnesses.
“[Benjamin] places great emphasis on the claim that Mr. Crespi did little work on mitigation, yet he hired Ms. Pettry as a mitigation consultant and the law permits the delegation of this responsibility to others. Hall v. State, 979 So.2d 125 (Ala.Crim.App.2007). She claims that Mr. Crespi prevented her from doing her job, yet she billed [Benjamin] $10,004.58, just over the $10,000 approved by the Court, an amount that [Benjamin] has not claimed as being unreasonable.
“The Court is also deeply troubled that Ms. Pettry feigns concern for [Benjamin’s] rights and status as a death row prisoner, yet she did not cooperate with [Benjamin’s] present attorneys to appear at the Rule 32 hearing so that she could be examined and cross-examined and this Court could effectively judge the credibility of her claims. She claimed to be ‘severely ill’ with a sinus and ear infection and purportedly could not travel from Virginia to Dothan, and then she could not travel due to neck and disc surgery. This Court made every effort to schedule an available time for Ms. Pettry to travel to Dothan at her convenience and physical status dictated, yet she constantly had some excuse as. to the infeasibility of travel.
“Rather, the Court chooses to look at the facts of Mr. Crespi’s and Ms. Lane’s representation of [Benjamin] during the penalty phase. A number of relatives and friends of the family were interviewed by the defense. Ms. Lane began contacting possible mitigation witnesses as early as 2001 and Ms. Lane was receiving information from Ms. Pettry as early as 2002. The defense subpoenaed [Benjamin’s] school records and his medical records and Ms. Lane traveled to Atlanta to meet a witness. Ms. Lane spoke with Khrystyna Severson ([Benjamin’s] sister), Elizabeth Gordon, Willie Burks, Ann Rich, Geneva Cull and Phillip Lester ([Benjamin’s school guidance counselor]). The jury in the penalty phase was presented with an accurate, complete and clear picture of [Benjamin’s] background and upbringing. The jury was aware that [Benjamin’s] father was not a part of his life and his caretakers had died. The evidence does not establish that [Benjamin] was prejudiced to any degree by the non-cooperation of Ms. Pettry during the trial phase.
[[Image here]]
“The defense presented a clear case of [Benjamin’s] life history, his difficult upbringing, and the deaths of his caregivers. Wiggins v. Smith, 539 U.S. 510 (2003). The defense presented an undisputed case to the jury of the great hardship and difficulty [Benjamin] faced being raised by multiple caregivers, most of whom died while he was in their care. [Benjamin] was apparently a ‘good kid’ with no history of violence or criminal behavior. The State offered no witnesses. In the Rule 32 trial the defense has offered the names of a number of people who, if asked, state that they would have testified for [Benjamin] at the penalty phase. However, the evidence shows that these witnesses either would be cumulative of the matters outlined above, their testimony (or some portion) would have been inadmissible or that it would have been of a non-specific nature. The mere fact that the other witnesses might have been available is not sufficient to establish ineffective assistance of counsel. Ferguson v. State, 13 So.3d 418 (Ala.Crim.App.2008); State v. Tarver, 629 So.2d 14 (Ala.1993).
“The Court finds that the record establishes that [Benjamin] had a constitu *447 tionally adequate mitigation defense, that all matters of substance were presented to the jury, and that [Benjamin] has failed to establish that if some or all of the matters alleged had been done that the outcome could have been different.
“Accordingly, the Court finds that [Benjamin] has failed to established that he is entitled to relief on this issue and it is denied.”
(C.R. 2003-07.) The circuit court’s findings are supported by the record.
Grespi testified at the postconviction evi-dentiary hearing that he requested and was granted funds to hire a mitigation expert to investigate for the penalty phase and that he hired Cheryl Pettry in October 2002. Crespi said:
“Ms. Pettry was to interview people who had potentially helpful evidence on the issue of penalty in this case, should there be a conviction of capital murder.
“She was to be part of the defense team in terms of discussion of trial strategy and the relationship between the guilt or innocence phase of the trial and the sentencing phase, if one should be necessary, and to develop some sort of timeline or narrative that would tie together the different forms of mitigating evidence that might turn up in the course of investigation.”
(R. 479-80.) Pettry billed the State $10,004 for her services on Benjamin’s case.
Lane testified that Crespi did not inform her until one week before Benjamin’s trial that she was going to be in charge of the penalty phase. She said that she told Crespi that she could not prepare in one week, that she contacted Pettry and that Pettry was upset, that Pettry provided her with an affidavit to give the trial judge expressing her concern that she was not prepared, that she gave the affidavit to
Judge White, that Judge White was upset and did not believe that Crespi was not prepared, that as a result of the affidavit he continued the penalty phase, and that the penalty phase was held on July 6, 2004, after the guilt phase had ended on May 27, 2004. On cross-examination, however, Lane said that after examining her time sheet she realized that she did talk with several mitigation witnesses in 2001, that she did receive notes from Pettry one year before trial, and that Pettry conducted several interviews and copies of those interviews were provided to her. She also said:
“[Lane]: I did as much as I could from the time the trial ended. I really didn’t have time to do anything prior to the trial starting. But after the trial ended, I tried to subpoena medical records, school records. And a lot of times, people would tell me, T need more time.’ They could not send it out as fast, you know, as I wanted it. But I did get some records in. I got some school records, I think, from at least one school and maybe a portion of his medical records.
“I spoke to as many people as I could between that time. I was unsuccessful in reaching some of the people.
[[Image here]]
“Well, I wanted to basically let the jury know about B.J.’s life, the hard time that he had had growing up, how he had been sent from home to home, his mother dying, things of that nature. That’s what I wanted to present, you know, and whatever else I could. His age, all the other factors. That’s what I wanted to present.”
(R. 99-105.) Pettry did not testify at the postconviction evidentiary hearing even though the circuit court went out of its way to continue proceedings to secure her *448 testimony. After the postconviction evi-dentiary hearing Benjamin attempted to introduce an affidavit executed by Pettry but the circuit court refused to allow that affidavit to be admitted.[13]
At Benjamin’s penalty phase, counsel presented the following witnesses in mitigation: Khrystyna Severson, Benjamin’s sister; Elizabeth Gordon, a friend who had known Benjamin since he was six years old; Reverend Robert Jones, the pastor at North Highland Baptist Church, the church Benjamin attended when he lived in Dothan; and Phillip Lester, Benjamin’s middle-school guidance counselor.[14] The record also shows that detailed letters were written on Benjamin’s behalf to the circuit court by Willie Burks, a longtime friend of Benjamin’s, and Roberta Grehl, one of Benjamin’s middle-school teachers. These individuals asked that the circuit judge spare Benjamin’s life.
Severson testified that Benjamin was her younger brother by one year, that their mother died when she was four years old and they moved in with their grandmother and grandfather, that their grandmother died in 1988 when Benjamin was 7 years old, that their grandfather died in 1990, that the two of them then moved to New Jersey to live with their uncle, that their uncle was strict and would spank them with a belt or belt buckles two or three times a week, that their uncle frequently called them stupid or idiots, that she and her uncle had a bad fight when she was 10 or 11 and that he put her on a bus to Dothan, that they had to make their own food at their uncle’s house, that after she left New Jersey when she was 10 or 11 she did not see her brother until she was 16, that Benjamin was a good brother and to protect her he often would take the blame for things she did, that she asked her uncle if she could come back about one year after she left and he refused, that when Benjamin was about 14 or 15 their uncle had a heart attack and died, that Benjamin discovered his body, that after the uncle died Benjamin moved back to Dothan and lived with his aunt, that their aunt did not give Benjamin the money he needed for his medicine, that Benjamin stayed about 6 months and moved to live with another uncle, and that Benjamin was very remorseful for what had happened. She then testified:
“[Defense counsel]: Did you make contact with your father regarding this case?
“[Severson]: Yes,
“[Defense counsel]: And what did you tell him?
“[Severson]: I told him that he needed to be there for his child right now, and that it’s not about him at this moment.
“[Defense counsel]: What did he say?
“[Severson]: He said, T ' understand what you’re saying, and I’m going to try to come.’
“[Defense counsel]: And was anything else discussed?
“[Severson] I told him that he hasn’t been there for him or nothing like that, and that he should be trying to come down here for his case. You haven’t been down here to visit him or anything.
“[Defense counsel]: Aid have you see him—
“[Severson]: No.
“[Defense counsel]: — since?
“[Severson]: Huh-uh.
*449 “[Defense counsel]: Do you know if he is here today?
“[Severson]: No.”
(Trial R. 659-60.)
Gordon testified that she had known Benjamin since he was six years old, that his mother’s death had a great impact on him, that at his mother’s funeral Benjamin tried to get in the coffin with his mother, that she developed a relationship with Benjamin after his mother died, that over the years she tried to see that Benjamin and his sister were okay, that when the children lived with their uncle they did not have adequate clothes, that she had seen Benjamin’s uncle beat Benjamin, and that their uncle paid little attention to Benjamin and his sister.
Reverend Jones testified that he met Benjamin when he was four years old, that his mother and then his grandparents brought him to church, that when he returned from New Jersey he was different and withdrawn, and that Benjamin actively participated in church activities.
Lester testified that he was Benjamin’s guidance counselor when he was in the sixth and seventh grades, that Benjamin had a difficult time with his uncle, that Benjamin needed help, that Benjamin barely saw his uncle, that his uncle paid no attention to Benjamin, and that Benjamin made D’s and F’s in school.
At the postconviction evidentiary hearing, counsel presented the following testimony that, he asserts, should have been presented in mitigation at the penalty phase of Benjamin’s trial.
Celestine Bullock, a friend of Benjamin’s who lived across the street from Benjamin from 1990 to 1994 when he was living with his uncle, testified that she picked Benjamin up from school and that he frequently was around her children. She said that Benjamin was nice, kind, and responsible, and that he was never a disciplinary problem. She was shocked, she said, when she discovered he had been charged with committing capital murder.
Geneva Pickett, a friend of Benjamin’s, testified that she had been a member of North Highland Baptist Church in Dothan for 40 years, that she met Benjamin when he first came to Dothan when he was a baby, that Benjamin’s mother died in a car accident, that Benjamin was then sent to live with his grandparents, that Benjamin’s grandmother then died, that Benjamin’s grandfather also died, and that Benjamin was then sent to live in New Jersey with his uncle. As a child, she said, Benjamin was sweet and mannerly. Pickett testified that when Benjamin came back to live in Dothan with his aunt he joined the choir at the church. She said that Benjamin had little supervision in his aunt’s house. She also read a letter that Benjamin had sent her from prison.
Graylain Arnold, a friend of Benjamin’s, testified that she went to high school with Benjamin, that they were good friends, that he had a lot of friends, that he was low key, that he never got into fights, that he had told her that he wanted to join the military when he graduated, and that he could not join because of his seizures.
Donald Doss, a friend of Benjamin’s, testified that he grew up down the street from Benjamin in Dothan, that Benjamin lived with him during his senior year in high school, that when Benjamin was living with his aunt the household was a good house to grow up in, that the year Benjamin lived with him Benjamin got into no trouble, and that Benjamin was a nice and mannerly young man.
Norene Daniels, Benjamin’s first cousin, testified that she lived in New Jersey when Benjamin lived there with his uncle. She said that Benjamin was a quiet, polite, *450 and smart and that she was shocked when she heard that he was arrested.
Ozie Bigham, the owner and operator of a halfway house and prison ministry, testified that he befriended Benjamin when Benjamin was in the Houston County jail sometime in 2001. He testified that Benjamin experienced great remorse for what had happened, that Benjamin attempted to minister to other inmates, and that Benjamin cared about others.
Julian Bruce Adams, one of Benjamin’s high-school teachers, testified that Benjamin was a student in his engineering-technology class in 1998 or 1999, that Benjamin was very quiet and introverted, and that Benjamin was very polite and obedient.
Wanda Emblom, a former teacher at Northview High School in Dothan, testified that Benjamin was one of her students in her biology class, that he was quiet and an average student, that he once had a epileptic seizure in her classroom, and that she was surprised to learn that Benjamin had been arrested.
Stuart Reese Corbitt, a friend of Benjamin’s, testified about the various locations Benjamin had lived while growing up and that he talked to Crespi before trial but that Crespi never contacted him about testifying.
Willie Burks, a friend of Benjamin’s, testified that he frequently saw Benjamin when he lived in New Jersey with his uncle, that Benjamin was a quiet, polite, and mannerly, that Benjamin’s uncle was a disciplinarian, that his uncle was not abusive to Benjamin, that after his uncle died Benjamin moved back to Dothan, and that he was shocked to learn that Benjamin had been arrested.
Karnahnee Jeffrey, Benjamin’s cousin, testified that Benjamin came to live with her father in New Jersey, that she visited her father about three times a year, that when she was in New Jersey she and Benjamin spent a lot of time together, that Benjamin was a “good kid, well adjusted,” that her father and Benjamin had a good relationship, and that she was shocked to learn that Benjamin had been arrested.
Leslie Benjamin, Benjamin’s father, testified that none of his 12 siblings had been contacted before Benjamin’s trial, that he was contacted by Pettry and spoke to her about 10 minutes before his son’s trial, and that neither Crespi nor Lane contacted him before Benjamin’s trial. He said that he married Benjamin’s mother, Hilda Jeffrey, in 1978, that Khrystyna was born in 1979 and Benjamin was born in 1981, that Hilda got involved with drugs, that when Benjamin was about three or four he and his sister were sent to live with Leslie’s sister, the children’s aunt, that Hilda went and picked up the children and took them back to Dothan, that she died shortly after that in a car accident, that he had no contact with his children until after Benjamin had graduated high school, that after Benjamin graduated he moved in with him in New Orleans for about two or three years, that Benjamin did have a job while living with him, that after Benjamin lost his job he went back to Dothan, and that he learned from his daughter that Benjamin had been arrested for murdering Jimmie Lewis.
Benjamin first argues that counsel was per se ineffective for failing to interview Benjamin’s father, Leslie Benjamin.
Lane testified on cross-examination that her time sheets showed that she tried to contact Leslie Benjamin but she did not believe that she was successful. Pettry’s documents reflect that she spoke with Leslie Benjamin and documented her discussion with him in a two-page memo.
*451 “There are few per se or ‘bright-line’ rules here; ineffective-assistance cases ‘turn on their individual facts.’ ” Payne v. United States, 78 F.3d 343, 348 (8th Cir.1996). “There is ... no per se rule that failure to interview witnesses constitutes ineffective assistance.” Sanders v. Trickey, 875 F.2d 205, 209 (8th Cir.1989). Moreover, “[i]t is neither unprofessional nor unreasonable for a lawyer to use surrogates to investigate and interview potential witnesses rather than doing so personally.” Walls v. Bowersox, 151 F.3d 827, 834 n. 4 (8th Cir.1998).
In Williams v. Head, 185 F.3d 1223 (11th Cir.1999), the United States Court of Appeals for the Eleventh Circuit considered whether counsel was ineffective for failing to interview the defendant’s father before trial. In addressing this claim, the court stated:
“Present counsel have proffered affidavits from Williams’ father and sister which, if believed, indicate that they could have provided additional mitigating circumstance evidence if they had been called as witnesses. It is not surprising that they have done so. Sitting en banc, we have observed that ‘[i]t is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called,’ but ‘the existence of such affidavits, artfully drafted though they may be, usually proves little of significance.’ Waters [v. Thomas ], 46 F.3d [1506] at 1513-14 [ (11th Cir.1995) ]. Such affidavits ‘usually prove [ ] at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel.’ Id. at 1514.
“This case is no exception. The record shows that the effort to prove that Allen, a sole practitioner, could have done better has been joined by four members of a large Atlanta law firm, a Florida lawyer with considerable experience in this area, a New York attorney, and others. With all of the resources and time they have devoted to the case, this squad of attorneys has succeeded in proving the obvious: if Allen had their resources and the time they have been able to devote to the case, he could have done better.
“Even putting the overwhelming disparity of resources to the side, we have recognized that ‘“[i]n retrospect, one may always identify shortcomings,” but perfection is not the standard of effective assistance.’ Id. (quoting from Cape v. Francis, 741 F.2d 1287, 1302 (11th Cir.1984)). As we held in Atkins v. Singletary, 965 F.2d 952, 960 (11th Cir.1992), ‘A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance.’ And in Waters we explicitly reiterated that: ‘The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel.’ Waters, 46 F.3d at 1514 (quotation and citation omitted); accord, e.g., Provenzano [v. Singletary ], 148 F.3d [1327] at 1333 [ (11th Cir.1998) ].
[[Image here]]
“The district court found that it was reasonable for Allen to believe that Williams’ father would not be helpful, considering that Williams had grown up apart from his father. The court also concluded that it was reasonable for Allen to think that there was little to be gained from interviewing Williams’ sis *452 ter, Alexsandrya, since nothing Allen had learned from Ms. Blair suggested that the sister might be more helpful than the mother. We afford Allen’s decision a presumption of reasonableness and substantial deference, all the more so because of his considerable experience in criminal cases. See supra at 1228-29.
[[Image here]]
“It is true, of course, that in hindsight it probably would have been better if Alen had gone further along these lines and interviewed all of Williams’ siblings and his father. Yet, one of the clearest principles in this area of the law is that, A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.’ Strickland, 466 U.S. at 689, 104 S.Ct. at 2065; see also Waters, 46 F.3d at 1514 (‘The widespread use of the tactic of attacking counsel by showing what “might have been” proves that nothing is clearer than hindsight — except perhaps the rule that we will not judge counsel’s performance through hindsight.’) Besides, insofar as the performance prong of an ineffective assistance inquiry is concerned, ‘[o]nce we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced.’ Rogers [v. Zant], 13 F.3d [384] at 388 [ (11th Cir.1994) ].
“... Other attorneys might have gone further in the investigation, but that is not the test. As we have explained: ‘The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.’ Waters, 46 F.3d at 1512 (quoting White v. Singletary, 972 F.2d 1218, 1220-21 (11th Cir.1992)).”
185 F.3d at 1236-39.
At the postconviction evidentiary hearing, the State introduced copies of several memorandums Pettry had written to Cres-pi. These memos indicated that Pettry spoke to the following individuals: Kar-nahnee Jeffrey, Benjamin’s cousin; Aunte-nese and Vernon McClain, Benjamin’s paternal aunt and uncle; Geneva Cull, a close family friend of Benjamin’s; Reverend Robert L. Jones, the pastor at the Baptist Church that Benjamin attended; Leslie Benjamin, Benjamin’s father; Sandra Jeffrey, Benjamin’s maternal aunt. A time-line compiled by Pettry about Benjamin’s life was also introduced.
The State also introduced documents from Lane’s files indicating that Lane had spoken to Benjamin’s sister, Khrystyna Severson; Elizabeth Gordon, one of Benjamin’s school teachers; Willie Burks, Benjamin’s uncle, Geneva Cull, Benjamin’s friend; Ann Rich, who is not identified; and Phillip Lester, Benjamin’s school counselor.
Admittedly, Benjamin presented more witnesses at the postconviction evidentiary hearing than were presented at his trial; however, this is not the standard for determining whether counsel’s actions constitute ineffective assistance.
“There has never been a case where additional witnesses could not have been called. The appellant presented relatives and personal friends who, upon interview, were found to testify on his behalf. We refuse to set a standard that a court may be reversed because it did not hear unoffered testimony from still more friends and relatives. We also *453 refuse to say that a member of the bar is guilty of ineffectiveness for not calling every witness and friend who was willing to testify. To hold otherwise would clog an already overburdened system with repetitious testimony.”
State v. Tarver, 629 So.2d 14, 21 (Ala.Crim.App.1993).
As detailed above, the testimony presented at the postconviction evidentiary hearing was largely cumulative of testimony that had been presented on Benjamin’s behalf at the penalty phase of his capital murder trial. “[T]he withholding of cumulative testimony will not ordinarily satisfy the prejudice component of a claim of ineffective assistance of counsel.” Taylor v. State, 352 N.W.2d 683, 687 (Iowa 1984). “Obviously, a petitioner cannot satisfy the prejudice prong of the Strickland test with evidence that is merely cumulative of evidence already presented at trial.” Devier v. Zant, 3 F.3d 1445, 1452 (11th Cir.1993). Likewise, the United States Supreme Court has refused to find prejudice when the testimony counsel failed to present was largely cumulative of testimony that had been presented. See Cullen v. Pinholster, — U.S. —, 131 S.Ct. 1388, 1409, 179 L.Ed.2d 557 (2011).
Moreover,
“In Strickland [v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ], we made clear that, to establish prejudice, a ‘defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ Id., at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.”
Wiggins v. Smith, 539 U.S. 510; 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).
In this case, the circuit court found one aggravating circumstance: that the murder was committed during the course of a robbery. The court found two statutory mitigating circumstances: that Benjamin did not have a significant history of prior criminal activity and that Benjamin was 19 years of age at the time of the murder. As nonstatutory mitigation, the circuit court found 20 different circumstances dealing with Benjamin’s upbringing and his remorse for the murder. We are confident that the omitted mitigation evidence, largely cumulative of evidence that had been presented, would have had no impact on the jury’s verdict in the penalty phase. The circuit court correctly denied relief on this claim of ineffective assistance of counsel.
IV.
Benjamin next argues that the circuit court erred in denying his claim that his trial counsel was ineffective for failing to object to various prosecutorial arguments. In this section of Benjamin’s brief, he makes no specific argument concerning any of the eight contentions, he merely cites a laundry list of claims in a two-page argument and various page numbers from the record.
The State asserts in its brief that this section of Benjamin’s brief fails to comply with the requirements of Rule 28(a)(10), Ala. R.App. P., because it fails to contain any specific argument in regard to any of the eight identified claims.
“ ‘It is not the job of the appellate courts to do a party’s legal research .... Nor is it the function of the appellate courts to “make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument.” ’ Pileri *454 Ind., Inc. v. Consolidated Ind., Inc., 740 So.2d 1108, 1110 (Ala.Civ.App.1999), quoting Dykes v. Lam Trucking, Inc., 652 So.2d 248, 251 (Ala.1994). . Because Jennings has failed to present sufficient argument, authority, or citation to the facts in support of this issue, we conclude that the he has failed to comply with Rule 28(a)(10) and that this issue is therefore, deemed to be waived.”
Jennings v. State, 965 So.2d 1112, 1136 (Ala.Crim.App.2006). We agree that this section of Benjamin’s brief fails to comply with the briefing- requirements of Rule 28(a)(10), Ala. R.App. P.
Moreover, even if Benjamin’s brief on this issue complied with Rule 28(a)(10), Ala. R.App. P., we would find that this claim has no merit. Benjamin states in his brief that his trial counsel was ineffective for failing to object to arguments made by the prosecutor that, he says: (1) vouched for the integrity of the State’s case; (2) elicited an opinion from the State’s lead investigator about Benjamin’s guilt; (3) urged the jury to consider nonstatutory aggravating factors; (4) presented argument calculated to inflame the jurors; (5) argued facts not in evidence; (6) made statements not supported by the record; (7) argued victim-impact evidence during the guilt phase; and (8) misled the jury concerning the law.
The circuit court addressed this claim in 15 pages of its order denying relief. The court stated, in pertinent part:
“This Court has carefully reviewed the transcript as well and find that the statements cited by [Benjamin] and attributed to the prosecutor did not infect the trial with unfairness to the degree [Benjamin] was deprived of a constitutionally fair trial. The overwhelming majority of quotations concern the prosecutor’s arguments and most were unobjectionable because they are a reply in kind, valid appeals to justice and permissible commentary on the evidence and the drawing of legitimate inferences consistent with the State’s theory or attempting to rebut [Benjamin’s] theory.”
(C.R. 1990.)
“[Interruptions of arguments, either by opposing counsel or the presiding judge, are matters to be approached cautiously.” United States v. Young, 470 U.S. 1, 13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). “A decision not to object to a closing argument is a matter of trial strategy.” Drew v. Collins, 964 F.2d 411, 423 (5th Cir.1992). To constitute error a prosecutor’s argument must have “so infected the trial with unfairness as to make the resulting [verdict] a denial of due process.” Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
This Court has carefully reviewed the challenged arguments. We agree with the circuit court that no argument so infected the trial with unfairness that Benjamin was denied due process. “Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue.” Lee v. State, 44 So.3d 1145, 1173 (Ala.Crim.App.2009).
V.
Benjamin next argues that the circuit court erred in denying his claim that his appellate counsel was ineffective for failing to raise the Batson claim on direct appeal and the claims of prosecutorial misconduct addressed in Part IV of this opinion. Attorney Crespi also represented Benjamin on direct appeal.
The circuit court made the following findings on this claim:
“[Benjamin] claims in his Rule 32 petition that Mr. Crespi, who was appointed as his attorney on direct appeal, was *455 constitutionally ineffective for not advancing a Batson claim and a claim of prosecutorial misconduct. The facts underlying these claims are the same as previously addressed as ineffective assistance of trial counsel. As previously discussed regarding the Batson claim, [Benjamin] has failed to establish that the State violated Batson in its peremptory strikes. The Court found a prima facie case of discrimination that the State successfully overcame by providing race neutral reasons. [Benjamin] alleges isolated instances of prosecutorial misconduct that he claims as a whole establish ineffective assistance of trial counsel and likewise appellate counsel for failure to address the claim on appeal. This involves the same matter as previously discussed and based on the foregoing reasons [Benjamin] has failed to establish that his trial counsel was constitutionally deficient in this regard, therefore his claim of ineffective assistance of appellate counsel claim must fail as well.”
(C.R. 2007-08.)
We agree with the circuit court. “Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue.” Lee v. State, 44 So.3d at 1173.
Moreover, “[experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.” Jones v. Barnes, 463 U.S. 745, 751-52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). The circuit court correctly denied relief on this claim.
VI.
Benjamin next argues that the circuit court erred in denying his claim that the jurors engaged in misconduct by conducting experiments in the jury room. Specifically, Benjamin argues that some of the jurors attempted to pull the trigger of the pistol used in the murder.
The circuit court made the following findings concerning this claim:
“[Benjamin] at his Rule 32 trial offered the testimony of juror [K.B.] that members of the jury pulled the trigger on the pistol used in the homicide. The Court sustained the State’s objection based on Rule 606(b) of the Alabama Rules of Evidence. A juror may testify regarding ‘extraneous prejudicial information [that] was improperly brought to the jury’s attention.’ In the present case the pistol was properly admitted into evidence as an exhibit and therefore it is neither ‘extraneous’ nor ‘prejudicial’ as contemplated by the Alabama Rules of Evidence. Further, a juror may not testify concerning the jury’s deliberations. Accordingly, this claim is denied for lack of evidence.”
(C.R. 2026.)
Rule 606(b), Ala. R. Evid., states:
“Upon an inquiry into the validity of a verdict or indictment, a juror may not testify in impeachment of the verdict or indictment as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon that or any other juror’s mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror’s mental processes in connection therewith, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury’s attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror’s affidavit or evi *456 dence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.”
Rule 606, Ala. R. Evid., allows a juror’s testimony only when it relates to the introduction of extraneous evidence that occurred during jury deliberations. Many courts have found that an experiment conducted by jurors is not improper and results in the admission of no extraneous evidence when the exhibits used to conduct the experiment were properly admitted into evidence at trial.
“An experiment or demonstration is proper when conducted by the jury with the use of exhibits properly submitted to it for the purpose of testing the truth of statements made by witnesses or duplicating tests made by witnesses in open court. Christopher & Son v. Kansas Paint & Color Co., 215 Kan. 185, Syl. P 12, 523 P.2d 709 (1974).”
State v. Ashworth, 231 Kan. 623, 629, 647 P.2d 1281, 1287 (1982).
Here, Benjamin’s trial counsel argued that the shooting occurred during a struggle and that Benjamin did not intend to shoot Lewis. Katherine Richert, the State’s firearms expert, testified concerning the amount of weight, or pressure, needed to pull the trigger on the gun used to kill Lewis. Richert said that the trigger required 13 pounds of pressure, which, she said, is a heavy trigger and not a “hair trigger.” (Richert’s testimony is quoted in Part II of this opinion.) In addressing a virtually identical situation, the Montana Supreme Court stated:
“A jury is not required to don ‘blinders’ when deliberating on a verdict. Juries are permitted to take into the jury room any exhibits deemed proper by the trial court. Section 95-1913(c), R.C.M. 1947.[15] Where, as here, the court permits the jury to examine a revolver used in a killing, the jury may use this physical evidence in conjunction with testimony given on the witness stand in determining the credibility of witnesses and the weight to be given their testimony. A critical examination of the firing of the revolver under the circumstances disclosed by the defendant in his testimony is not only permissible but enlightened. In searching for the truth, a jury is permitted to use common sense unfettered by illogical restraints.”
State v. Thompson, 164 Mont. 415, 424, 524 P.2d 1115, 1120 (1974). See also Sharon Blanchard Hawk, State v. Mann: Extraneous Prejudicial Information in the Jury Room: Beautiful Minds Allowed, 34 N.M.L.Rev. 149 (2004); Caroll J. Miller, Propriety of Juror’s Tests or Experiments in Jury Room, 31 A.L.R.4th 566 (1984); State v. Rainer, 411 N.W.2d 490, 498 (Minn.1987) (“There are no Minnesota cases that deal with experiments conducted by the jury in the jury room. Cases from outside the jurisdiction indicate that experimentation with weapons in evidence and re-enactment of incidents by the jury are permissible.”).
We agree with the circuit court that KB.’s affidavit was properly excluded pursuant to Rule 606, Ala. R. Evid., because it addressed juror deliberations and not the consideration of extraneous information. Benjamin was due no relief on this claim.
VII.
Benjamin next argues that the circuit court erred in finding that his claim *457 that his death sentence was disproportionate and in violation of the Eighth Amendment was a claim that was procedurally barred in this postconviction proceeding. In his petition, Benjamin claimed that his death sentence was disproportionate, that the proportionality review conducted by this Court on direct appeal was inadequate, that Alabama’s capital-sentencing scheme is arbitrary and capricious, and that his counsel was ineffective for failing to raise on appeal that his death sentence was disproportionate.
The circuit court stated the following concerning this claim:
“The Court finds that this claim is procedurally barred because the substance of the claim was raised and addressed on appeal. Benjamin v. State, 940 So.2d 371 (Ala.Crim.App.2005). Further, no evidence was presented on this matter at the Rule 32 trial. Rule 32.2(a)(4); Rule 32.9(d), Ala. R.Crim. P. It is denied.”
(C.R. 2008.)
All the claims concerning this issue except the ineffective-assistance-of-counsel claim were procedurally barred in Benjamin’s postconviction proceeding. See Rule 32.2(a)(5), Ala. R.Crim. P.
Moreover, on direct appeal this Court considered whether Benjamin’s sentence was disproportionate and found that his death sentence was not. See Benjamin v. State, 940 So.2d at 387. Thus, counsel was not ineffective in regard to this claim.
VIII.
Benjamin next argues that the circuit court erred in excluding the statements of several mitigation witnesses at the postconviction evidentiary hearing. Specifically, he argues that the circuit court erroneously held that the evidence was not admissible because it was hearsay. Benjamin argues that because hearsay evidence is admissible at the penalty phase of a capital-murder trial, it should also be admissible in the postconviction proceedings of a capital-murder trial.
At the conclusion of the postconviction evidentiary hearing, Benjamin attempted to introduce several affidavits from out-of-state witnesses who, he said, could not attend the hearing. The State objected and argued that it had no opportunity to cross-examine the witnesses. The post-conviction court declined to allow these challenged affidavits to be presented. (R. 787.)
“As a general rule, an affidavit is hearsay and, therefore, not admissible for the purpose of proving the truth of the matter stated in it.” Charles Gamble, McElroy’s Alabama Evidence § 260.01 (6th ed.1996). “An affidavit is inadmissible hearsay and cannot be offered as substantive evidence.” Associates Fin. Serv. Co. of Alabama, Inc. v. Barbour, 592 So.2d 191, 196 (Ala.1991).
As this Court has stated:
“The Alabama Rules of Evidence apply to Rule 32 proceedings. Rule 804, Ala. R. Evid., specifically excludes hearsay evidence. We addressed this identical issue in Giles v. State, 906 So.2d 963 (Ala.Crim.App.2004), overruled on other grounds, Ex parte Jenkins, 972 So.2d 159 (Ala.2005), and stated:
“ ‘Giles specifically argues that the circuit court erroneously failed to consider the hearsay testimony of two witnesses as to what Giles told them about a drug relationship between him and Carl Nelson. Giles argues that the circuit court misapplied the evi-dentiary rules governing capital sentencing because hearsay evidence is admissible at the sentencing portion of a capital-murder trial.
*458 “ ‘However, what Giles fails to consider is whether the Rules of Evidence apply to Rule 32 proceedings. See Rule 101, Ala. R. Evid., and Rule 1101(a), Ala. R. Evid., which states, in part, “these rules of evidence apply in all proceedings in the Courts of Alabama....” Rule 1101(b), Ala. R. Evid., lists the proceedings exempt from application of the Rules of Evidence. Those proceedings include proceedings concerning preliminary questions of fact, grand jury proceedings, extradition proceedings, preliminary hearings in criminal cases, sentencing or probation revocation hearings, proceedings related to the issuance of a warrant of arrest, criminal summonses, or search warrants, bail proceedings, and contempt proceedings.
“‘The Rules of Evidence apply to postconviction proceedings. See DeBruce v. State, 890 So.2d 1068 (Ala.Crim.App.2003). Rule 804, Ala. R. Evid., specifically excludes hearsay evidence. The circuit court correctly applied existing law and excluded the hearsay statements presented concerning an alleged drug relationship between Giles and one of the victims. After excluding the hearsay evidence, the circuit court was left with no lawful evidence to support this contention. Relief was correctly denied on this ground. See DeBruce, supra.’ ”
Hunt v. State, 940 So.2d 1041, 1051 (Ala.Crim.App.2005). See Broadnax v. State, 130 So.3d 1232 (Ala.Crim.App.2013), and cases cited therein.
The postconviction court committed no error in not allowing the affidavits to be admitted at the evidentiary hearing.
DC
Benjamin next argues that the circuit court erred in summarily dismissing several of his claims before the evidentiary hearing.
The circuit court may summarily dismiss a claim that presents “no material issue of fact or law” or a claim that is procedurally barred. See Rule 32.7(d), Ala. R.Crim. P.
A.
First, Benjamin argues that the circuit court erred in summarily dismissing his claim that the sentencing judge was without jurisdiction to hear his case because, he says, the statute governing special appointment of judges, § 12-1-14, Ala. Code 1975, provides only that judges may be appointed for “temporary service” not to exceed 180 days and that the judge in this case presided over his trial and sentencing for more than 6 years.
The circuit court summarily dismissed this claim and stated:
“Benjamin claims that Judge Jerry M. White unconstitutionally presided over his trial and sentencing. Benjamin has not presented this Court with any case-law demonstrating how the Supreme Court’s appointment of Judge [Jerry] White did not lawfully fit within the meaning of ‘temporary service’ under Ala.Code § 12-1-14,[ Ala.Code 1975]. Furthermore, this court is unaware of any caselaw providing authority for this Court to issue a ruling stating that an order of appointment by the Alabama Supreme Court was unconstitutional. Accordingly, this Court finds this claim fails to state a material issue, is without merit and is therefore summarily dismissed. Ala. R.Crim. R, 32.7(d).”
(C.R. 856-57.)
Section 12-1-14, Ala.Code 1975, states, in pertinent part:
“Should the need for special judges in the circuit court, district court or probate court arise, the Supreme Court *459 may appoint and commission special circuit judges or special district court judges or special probate judges for temporary service; provided, however, that the person so appointed shall possess the qualifications of the judgeship to which he is appointed. Such special judges shall qualify by taking the oath of office prescribed in the Constitution.”
“Temporary service” is defined in § 12-1-14.1(b), Ala.Code 1975. This section states: “As used in this section, the term ‘temporary service’ means not more than 180 consecutive days. A special judge may be reappointed, as needed, for more than one period of 180 consecutive days.”
In this case; however, Retired Circuit Judge Jerry M. White was appointed by the Chief Justice of the Alabama Supreme Court pursuant to § 12-17-25, Ala.Code 1975, entitled “Appointment of Relief Judges to Assist in Clearing Dockets.” This section provides:
“Any judge shall, whenever he deems it necessary, call on the Chief Justice of the Supreme Court to assign one or more judges to relieve the judges who need assistance in clearing dockets, civil and criminal.”
A new order appointing Judge White was issued by the Chief Justice every year.
Regardless of whether the appointment was lawful, the Alabama Supreme Court has recognized that a judge who serves in a similar capacity without objection is a de facto officer. In Gwin v. State, 808 So.2d 65 (Ala.2001), the Alabama Supreme Court reversed this Court’s judgment holding that the appointment of the trial judge in the case was invalid because that judge did not reside in the same county. In setting, aside this Court’s judgment, the Supreme Court stated:
“Gwin did not object to [the special judge’s] appointment before the judgment of conviction and sentence was entered. [The special judge], who was holding the office of circuit judge and was exercising the functions thereof, was a de facto officer when he accepted Gwin’s plea. ‘ “A de facto officer is one who exercises the duties of a de jure office under color of appointment or election....”’ Dixie Dairies v. Alabama State Milk Control Bd., 286 Ala. 198, 202, 238 So.2d 551, 554 (1970) (quoting Ex parte Register, 257 Ala. 408, 413, 60 So.2d 41, 46 (1952)). Section 36-1-2, Ala.Code 1975, which protects the actions of defacto officers, reads:
“ ‘The official acts of any person in possession of a public office and exercising the functions thereof shall be valid and binding as official acts in regard to all persons interested or affected thereby, whether such person is lawfully entitled to hold office or not and whether such person is lawfully qualified or not....’
“(Emphasis added.) The judgment Gwin appealed from is valid and remains intact as an action of a de facto officer protected by statute.”
808 So.2d at 67.
This appears to be the first time Benjamin has objected to Judge White’s presiding over his trial and sentencing. Pursuant to Gwin v. State, because Judge White served without objection he was a de facto officer protected by statute. Thus, this claim was correctly summarily dismissed as it failed to state a claim upon which relief could be granted. See Rule 32.7(d), Ala. R.Crim. P.
B.
Benjamin next argues that the circuit court erred in summarily dismissing his claim that his counsel was ineffective for failing to properly respond to the State’s denial of his right to confront his accusers. *460 Specifically, Benjamin challenged his trial counsel’s failure to effectively argue that his right to confrontation was violated when the State introduced statements made by Benjamin and audio-taped when Michael Baker was wearing a body wire.
The circuit court stated the following when summarily dismissing this claim:
“Benjamin claims that both his trial and appellate counsel did not effectively challenge the State’s use of statements by non-witness Michael Baker during a conversation with Benjamin, which was recorded through use of a body wire. However, the Court of Criminal Appeals addressed the underlying argument regarding the admission of Baker’s statement and held that the statements were not testimonial and were not a violation of the Sixth Amendment under Crawford v. Washington, 541 U.S. 36 (2004). See Benjamin v. State, 940 So.2d 371, 380 (Ala.Crim.App.2005). Therefore, trial and appellate counsel could not be ineffective for failing to more effectively raise and argue this issue. Accordingly, this claim is without merit and is dismissed. Ala. R.Crim. P., 32.7(d).”
(C.R. 858-59.)
“Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue.” Lee v. State, 44 So.3d 1145, 1173 (Ala.Crim.App.2009). This claim was correctly summarily dismissed because it failed to state a claim upon which relief could be granted. See Rule 32.7(d), Ala. R.Crim. P.
C.
Benjamin next argues that the circuit court erred in summarily dismissing his claim that his trial and appellate counsel were ineffective for failing to effectively argue that the trial court’s jury instructions on felony murder and reasonable doubt were improper.
The circuit court stated the following when summarily dismissing this claim:
“This Court finds that these claims are without merit and are hereby summarily dismissed. Ala. R.Crim. P. 32.7(d). This Court finds both that trial counsel requested and that the trial court accordingly gave a standard instruction regarding felony murder to the jury. (C. 160.) This Court also finds that the trial court gave a standard, pattern jury instruction on reasonable doubt which has been previously upheld by Alabama courts. (R. 597-98); see Lee v. State, 898 So.2d 790, 842 (Ala.Crim.App.2003). Accordingly, because the trial court’s instructions were proper, Benjamin’s counsel could not be ineffective for [not] challenging the instructions. Therefore, this claim is summarily dismissed. Ala. R.Crim. P., 32.7(d).”
(C.R. 859-60.)
The record shows that Benjamin’s counsel requested 16 different jury instructions at the guilty phase. (Trial record C.R. 159-166.) The circuit court refused two of those instructions and one instruction was withdrawn.
In his petition, Benjamin asserted that the court failed to distinguish the difference between capital murder and felony murder and that the court’s instructions on reasonable doubt were erroneous. Like the circuit court, we have carefully reviewed the jury instructions, and we find no error. The circuit court instructed the jury on capital murder and the lesser offenses of felony murder, murder, manslaughter, and robbery and properly distinguished each offense. The jury instructions on reasonable doubt were thorough and accurate. “Because the substantive claim underlying the claim of ineffective assistance of coun *461 sel has no merit, counsel could not be ineffective for failing to raise this issue.” Lee v. State, 44 So.3d 1145, 1173 (Ala.Crim.App.2009).
D.
Benjamin next argues that the circuit court erred in summarily dismissing his claim that his counsel was ineffective during the sentencing hearing. In his petition, Benjamin asserted that counsel was ineffective at the sentencing hearing before the judge because he failed to present additional mitigation evidence.
The circuit court stated the following when summarily dismissing this claim:
“This claim is without merit under Ala. R.Crim. P. 32.7(d) and is therefore summarily dismissed. Benjamin is entitled to present evidence at this eviden-tiary hearing in support of his claim that his counsel was ineffective during the penalty phase of the trial. However, the presentation of any mitigating evidence pertaining to Benjamin’s claim of ineffective assistance of counsel during his sentencing hearing would be cumulative.”
(C.R. 860-61.)
This section of Benjamin’s brief fails to comply with the requirements of Rule 28, Ala. R.App. P. “Because [Benjamin] has failed to present sufficient argument, authority, or citation to the facts in support of this issue, we conclude that the he has failed to comply with Rule 28(a)(10) and that this issue is therefore, deemed to be waived.” Jennings v. State, 965 So.2d 1112, 1136 (Ala.Crim.App.2006). Benjamin has waived this argument on appeal.
E.
Benjamin next argues that the circuit court erred in summarily dismissing his claim that his death sentence violates the Equal Protection Clause and that his counsel was ineffective for failing to raise this issue.
The circuit court stated the following when summarily dismissing this claim:
“Benjamin claims that his death sentence violates the Equal Protection Clause of the Fourteenth Amendment because the Alabama capital sentencing system in general fails to provide equal protection. The Court finds that this claim is procedurally barred because it was raised at trial and on appeal. Ala. R.Crim. P., 32.2(a)(2), (4). Because this claim is procedurally barred, it is hereby dismissed. Ala. R.Crim., P. 32.7(d).
“... Benjamin claims that his death sentence violates the Equal Protection Clause of the. Fourteenth Amendment because the Alabama capital sentencing system as applied to his case failed to provide equal protection. The Court finds that to the extent that [Benjamin] makes a specific equal protection claim not raised at trial or on appeal, this claim is also procedurally barred because it could have been but was not raised or addressed at trial or on appeal. Ala. R.Crim. P., 32.2(a)(3), (5). Because this claim is procedurally barred, it is hereby dismissed. Ala. R.Crim. P., 32.7(d).
“... Benjamin claims that his appellate counsel was ineffective for failing to properly challenge his death sentence as a violation of the Equal Protection Clause. While not procedurally barred, the Court finds that this claim is without merit and is due to be dismissed. Ala. R.Crim. P. 32.7(d). The Court of Criminal Appeals reviewed Benjamin’s death sentence for plain error and found that this sentence was appropriate and not disproportionate. Benjamin, 940 So.2d at 387-88. Therefore, because this *462 claim is without merit, it is summarily-dismissed. Ala. R.Crim. P., 32.7(d).”
(C.R. 855-56.)
As this Court has stated:
“[The appellant] also contends that our death-penalty scheme violates the Equal Protection Clause because, he says, it is arbitrary and disparate in that it fails to set forth uniform standards as to the weight a trial court must give a jury’s sentencing recommendation. As 'authority for this proposition, Lewis cites the decision in Bush v. Gore [, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) ]. We fail to see how this decision lends support for Lewis’s claim, given that the Supreme Court took care to state that its decision was ‘limited to the present circumstances,’ noting that ‘the problem of equal protection in election processes generally present many complexities.’ 531 U.S. at 109, 121 S.Ct. [at 532], Moreover, in Harris v. Alabama, 513 U.S. 504, 511-15, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), the United States Supreme Court rejected a claim that Alabama’s death penalty statute was unconstitutional because it did not specify what weight the trial court must afford a jury’s recommendation. Alabama courts have rejected similar claims that trial judges deprive defendants of equal protection under the law by employing different processes in determining what weight to give a jury’s recommendation as to sentencing. See, e.g., Smith v. State, 756 So.2d 892, 920 (Ala.Crim.App.1997), aff'd, 756 So.2d 957 (Ala.), cert. denied, 531 U.S. 830, 121 S.Ct. 82, 148 L.Ed.2d 44 (2000). Thus, no basis for reversal exists as to these claims.”
Lewis v. State, 24 So.3d 480, 536 (Ala.Crim.App.2006).
This claim was correctly summarily dismissed as it failed to state a claim upon which relief could be granted. See Rule 32.7(d), Ala. R.Crim. P.
F.
Benjamin last argues that the circuit court erred in summarily dismissing his claim that Alabama’s lethal-injection procedures violate the Eighth Amendment to the United States Constitution.
The circuit court stated the following concerning this claim:
“This claim is summarily dismissed because it is without merit and as pleaded fails to state a material issue that entitles Benjamin to relief. Ala. R.Crim. P. 32.7(d). Alabama courts have consistently rejected similar challenges and have held that lethal injection is not cruel and unusual punishment. McNabb v. State, [991 So.2d 313] (Ala.Crim.App.2007); Bryant v. State, 951 So.2d 732, 748 (Ala.Crim.App.2003). Therefore, because this claim is without merit, it is summarily dismissed. Ala. R.Crim. P. 32.7(d).
“Benjamin claims ... that this counsel was ineffective for failing to effectively challenge at trial and on appeal Alabama’s lethal injection procedures. This Court finds that this ineffective assistance of counsel claim fails to state a material issue and is therefore summarily dismissed. Ala. R.Crim. P., 32.7(d)....”
(C.R. 857-58.)
The Alabama Supreme Court in Ex parte Belisle, 11 So.3d 323 (Ala.2008), addressed the constitutionality of Alabama’s method of execution, lethal injection, and stated:
“In Baze [v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) ], two death-row inmates challenged Kentucky’s use of the three-drug protocol, arguing ‘that there is a significant risk *463 that the procedures will not be properly followed — in particular, that the sodium thiopental will not be properly administered to achieve its intended effect— resulting in severe pain when the other chemicals are administered.’ 553 U.S. at [50], 128 S.Ct. at 1530. Belisle’s claim, like the claims made by the inmates in Baze, ‘hinges on the improper administration of the first drug, sodium thiopental.’ Baze, 553 U.S. at [53], 128 S.Ct. at 1533.
“The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze, 553 U.S. at [62,] 128 S.Ct. [1520,] 1538, and noted that ‘[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.’ Baze, 553 U.S. at [61,] 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that ‘Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.’ Baze, 553 U.S. at [114,] 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana ‘provide a degree of assurance— missing from Kentucky’s protocol — that the first drug had been properly administered.’ Baze, 553 U.S. at [121], 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. ‘Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of “objectively intolerable risk of harm” that qualifies as cruel and unusual.’ Baze, [553 U.S. at 50,] 128 S.Ct. at 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.”
11 So.3d at 339. The circuit court correctly found that this issue was subject to summary dismissal as it failed to state a claim upon which relief could be granted. See Rule 32.7(d), Ala. R.Crim. P.
For the above-stated reasons, we affirm the circuit court’s denial of Benjamin’s postconviction petition attacking his capital-murder conviction and the sentence of death.
AFFIRMED.
WINDOM, P.J., and WELCH, BURKE, and JOINER, JJ., concur.

. It appears that some of the delay in ruling on Benjamin's Rule 32 petition was caused by the fact that the case was reassigned to Judge Brady E. Mendheim in February 2009.

. Juror questionnaires are part of the voir dire process. See Luong v. State, [Ms. CR-08-1219, February 15, 2013] — So.3d — (Ala. Crim.App.2013).

. To protect the anonymity of the jurors, we are using their initials.

. The juror questionnaire used in this case is contained in the record of Benjamin’s direct appeal. (Trial Record C.R. 107.)

. We disagree with Benjamin's characterization of the evidence as exoneration evidence. "Exonerate” is defined in Black's Law Dictionary as "[t]o free from responsibility.” Black's Law Dictionary 657 (9th ed. 2009). None of the evidence Benjamin claims was omitted would have exonerated him.

. The order denying postconviction relief shows the spelling “Nodel” for this witness; *440 however, this witness testified that his name was spelled "Noedel.” (C. 357.)

. "When courts are examining the performance of an experienced trial counsel the presumption that his conduct was reasonable is even stronger.” Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir.2000).

. There is nothing in the record that reflects the results of the psychological tests and no *441 psychological testimony was presented in the postconviction proceedings.

. The trial record shows that the circuit court gave instructions on four lesser-included offenses of capital murder: felony murder, murder, manslaughter, and robbery. (Trial R. 585-92.)

. " '[I]t is neither unprofessional nor unreasonable for a lawyer to use surrogates to investigate and interview potential wit-
nesses rather than doing so personally. See Harris v. Dugger, 874 F.2d 756, 762 & n. 8 (11th Cir.1989). In fact, we have criticized counsel in other cases for failing to utilize subordinates to conduct pre-trial investigation. See Henderson v. Sargent, 926 F.2d 706, 714 (8th Cir.1991).’ "
Hall v. State, 979 So.2d 125, 163 (Ala.Crim.App.2007), quoting Walls v. Bowersox, 151 F.3d 827, 834 n. 4 (8th Cir.1998).

. Richert was deposed for the postconviction proceedings; her deposition testimony was read into the record.

. Crespi argued at trial that the absence of these tests tended to establish a reasonable doubt as to Benjamin’s guilt.

. We address the validity of the court’s ruling excluding affidavits in Part VIII of this opinion.

. The record also contains detailed letters written to the circuit judge by Gordon and Lester. (C.R. 188-191.)

. The Alabama Rules of Criminal Procedure contain a comparable rule. Rule 22.1(b), Ala. R.Crim. P., states: "Within the exercise of its discretion, the court may permit the jurors, upon retiring for deliberations, to take with them exhibits, writings, and documents that have been received in evidence.”